# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 16-CR-0054 |
| v. ) | |
| ) | |
| GARY T. BOHN ) | Honorable Franklin U. Valderrama |
| ) | United States District Court Judge |

## **DEFENDANT GARY BOHN'S SENTENCING MEMORANDUM**

Defendant Gary Bohn, by his undersigned counsel, respectfully submits that a sentence of three years' probation and an order of restitution in the amount of $923,000 is a sufficient, but not greater than necessary sentence based on Gary's limited role in the scheme, active cooperation in this and other cases, early payment of restitution, the need to avoid sentencing disparity, and other factors as described below:

**I.     INTRODUCTION**

Gary Bohn is a devoted father, son, and friend who made a terrible mistake more than 12 years ago. At that time, Gary was working for American Fidelity, a mortgage brokerage owned and operated by Steven and Michael Garcia. Gary was assigned to work with two of Garcia's clients, contractors Mark Diamond and Matt Fefferman. Diamond and Fefferman ran fraud schemes as far back as 2008 (before Gary even worked for American Fidelity). When Gary first started working for Garcia, he was unaware of their schemes. Over time, however, he learned about what they were doing and unfortunately went along with it, continuing to facilitate the loans. That he felt he needed his job was no excuse.

In 2013, the rules changed about how much a homeowner could obtain at the closing of a reverse mortgage. Gary learned from Garcia and another individual that if a contractor filed a mechanic's lien against the property, the contractor could obtain funds at closing directly and more

quickly than the rules would allow. Unfortunately, Gary continued to work on these loans and looked the other way as Diamond and Fefferman filed false mechanic's liens throughout the remainder of 2013 and into 2014.

When contacted by law enforcement in February 2015, Gary immediately agreed to cooperate. His cooperation was extraordinary. As outlined by the government, Gary sat for multiple, extended proffer sessions to provide the factual background of Garcia's, Diamond's, and Fefferman's conduct. Gary agreed to testify if called as a witness without any specific promise from the government. Diamond and Fefferman were charged in this case (16 CR 54) and both pleaded guilty. Significantly, Gary also wore a recording device on several occasions in early 2015 and actively developed evidence that allowed the government to separately bring charges against Steven and Michael Garcia, 17 CR 798. Both pleaded guilty.

Gary has lived under a dark cloud for more than 10 years. At the time of sentencing, Gary will stand before this Court humbled and with deep regret. He is not the same man as he was when the offense conduct took place. He is committed to continuing to make restitution payments, caring for his elderly mother and autistic daughter, volunteering his time for his community, and otherwise making amends. He forever will bear the stigma, public embarrassment, and financial and other costs associated with this felony conviction.

## II. A SENTENCE OF PROBATION AND AN ORDER OF RESTITUTION WILL SERVE THE § 3553(A) FACTORS.

The goal of sentencing is to fashion a sentence that is "sufficient, but not greater than necessary," to promote the goals established and codified by Congress. 18 U.S.C. § 3553(a). The guidelines are advisory, and a court may sentence outside the guideline range as long as it considers the § 3553(a) factors. Indeed, it is the district court's duty to "make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration of) the advice of the Guidelines" if

the result they suggest does not comport with the sentencing court's view of an appropriate sentence. *Kimbrough v. United States,* 552 U.S. 85, 113 (2007) (Scalia, J., concurring).

The Supreme Court has emphasized that sentencing courts should impose a punishment that "fit[s] the offender and not merely the crime." *Pepper v. United States,* 131 S. Ct. 1229, 1240 (2011). Moreover, the Supreme Court has rejected outright the notion that "extraordinary" circumstances must exist to justify a sentence outside the advisory Guideline range, including cases in which courts depart from advisory guideline ranges to impose a non-custodial sentence. *Gall v. United States,* 552 U.S. 38, 47 (2007) (finding district court's departure from advisory guideline range of 30-37 months to impose sentence of probation was not an abuse of discretion).

To determine a sentence that is sufficient, but not greater than necessary, to fulfill the purposes of sentencing, § 3553 directs consideration of several well-known factors. 18 U.S.C. § 3553(a); *see United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("the statute does not weigh the factors ... that is left to the sentencing judge, within the bounds of reason, which are wide."). Defendant respectfully submits that, after considering these factors, a sentence of three years' probation and an order of restitution is a sufficient sentence.

### A. History and Characteristics of the Defendant

Gary will be a few months shy of turning 60 years old at the time of sentencing. He has had a challenging life largely impacted by the lack of a male role model. Before the age of two, Gary's biological father left his mother (then 19). Gary then went from step-father to step-father, both of whom were daily drinkers. One, an imposing 6'4" man, physically threatened Gary. At about the age of 15, Gary was left in the care of his grandparents because his mother had remarried for a third time and moved to Wisconsin.

Without much direction, Gary did not excel at school. Gary experimented with and then began using marijuana and alcohol as a teenager. When Gary attempted to reconnect with his father in his later teen years, his father used him, asking Gary to obtain cocaine and marijuana for him. PSR ¶ 64. As noted in the PSR, Gary's father was sexually depraved and clearly not a positive influence. *Id.*

Gary did not complete college. He simply lacked direction as a young adult. He bounced around several jobs and eventually got into real estate as a mortgage broker. Around this time, he was dating a woman who hid from him the fact that she already was married. PSR ¶ 71. In 2003, they had a daughter. After the birth of his daughter, Gary stopped using controlled substances altogether and devoted himself to providing financial and emotional support for his daughter, who suffers from severe autism. *Id.* Gary has worked very hard to be a rock for his daughter, despite having difficulty with her mother. PSR ¶ 71.

The real estate crash of 2008 decimated Bohn's profession. After spending many months unemployed, Gary felt lucky to get a job from Garcia at American Fidelity. Gary offers no excuse for his conduct. He remains devastated by his own behavior and carries deep regret. The fact that he felt at the time that he needed his job at American Fidelity for financial support for himself and his daughter is no excuse. Through his cooperation and efforts at early restitution, Gary has done his best to accept responsibility for his conduct and make amends.

Gary is now twice divorced. Shortly before starting work for Garcia, Gary met a woman and married. Gary funded her schooling. Once she secured good employment, she repeatedly cheated on him. PSR ¶ 68. Gary participated in counseling and other efforts to save this marriage, ultimately without success. *Id.* The divorce proceedings, just recently completed, have been emotionally and financially devastating for Gary. *Id.*

Despite his personal struggles, Gary is known to his family and friends as a kind, loving man who cares about his community. In a letter to the Court, his mother wrote, "if there was a single word to describe him, the word would be kind." (Exhibit A, Letter from Frances Elsner). His sister observed, "Gary is a thoughtful and kind man who cares deeply for his family and community." (Exhibit A, Letter from Jennifer Bohn) She added that Gary has been "reflective in his personal development, striving to be the best man he can be." *Id.* Even the sister of his ex-wife was moved to support Gary, noting "we formed a great bond and kinship which outlasted the divorce. [Gary] proved to be a sincere, responsible, and balanced man." (Exhibit A, Letter from Monika Gorczyca-Byczek)

Gary now spends most of his free time caring for his mother, supporting his daughter, and volunteering his time. Gary's mother will turn 79 years old a few weeks after sentencing. He has an excellent relationship with his mother, with whom he speaks every day. She is elderly, facing numerous physical challenges. She has frequent falls and is showing early signs of Parkinsons, a disease that runs in the family. In many respects, Gary has become her caretaker. In a letter for the Court, his mother explained that Gary "lives close to me so that I can call him if there are problems so that he can drive over to help me." (Exhibit A, Letter from Frances Elsner)

Gary is incredibly close to his daughter. As she wrote in her letter to the Court, she views her father as a "role model" who has helped her seek out a normal life despite her challenges. (Exhibit A, Letter from Anne-Marie Bohn). She noted, "My dad has shown myself, my brother, and many other friends, family, and even strangers so much kindness, compassion, and love over the years." (*Id.*) Gary's friends and family have noticed his dedication to his daughter. The older daughter of Anne-Marie's mother wrote, "Gary has always been a devoted father to Anne-Marie. He ensured she had access to the resources and support she needed, and his advocacy and love

5

throughout the years have helped shape the person she is today. His dedication to her growth and development has been unwavering." (Exhibit A, Letter from Brandie Nations)

Beyond family, Gary always has recognized the importance of volunteering his time for his community. He takes his faith seriously. In his youth, Gary volunteered to serve Thanksgiving meals at a local church. As Gary became an adult, he grew active in the Salvation Army's "Meals on Wheels" program. In addition to volunteering time, Gary has served in leadership positions at several community organizations, including as a member of the Budget Committee for United Way. Gary currently serves on the Board of Advisors and as a member of the Finance Committee for the Greater Chicagoland Chapter of the Salvation Army. Additionally, Gary has participated in several trips to Cuba, raising tens of thousands of dollars for a group of Catholic nuns that help operate an orphanage and a cancer treatment center. Importantly, Gary began donating his time (and money when he could) to serve his community long before being charged in this case. He does so for the right reasons.

**B.     Nature and Circumstances of the Offense**

In late 2009, after spending months unemployed following the 2008 mortgage crisis, Gary was able to find a job with Garcia's mortgage brokerage, American Fidelity. In the first couple years, Gary was unlicensed and worked as an assistant to Garcia, who reviewed and approved every transaction. After receiving his own license in January 2012, Gary became a loan originator but still worked for and reported to Garcia. Gary did not work for co-defendant contractors Diamond or Fefferman.

When he first started working for Garcia, Gary was not aware of Garcia's, Diamond's and Fefferman's schemes. This is important, as the superseding indictment charged that Diamond and Fefferman devised and participated in a fraud scheme as far back as 2008. Bohn was not part of

6

the scheme at its origin. Gary did not even work for Garcia yet. When he started work, Gary was aware of Diamond's contracting business in part because Diamond had successfully performed repairs on Bohn's mother's house. And, Gary believed that Fefferman completed the repairs that he promised to make. Only after time did Gary become aware of the complaints about Diamond. Gary, as well as others at American Fidelity, tried to address these complaints by contacting Diamond but to no avail. Eventually, Gary stopped working altogether with Diamond in 2014. But that was too late – despite knowing in 2013 and most of 2014 that Diamond and Fefferman were filing false liens, Gary continued to facilitate reverse mortgages for their clients. Gary will forever regret his participation in the scheme.

Gary had a more limited role in the offense than his co-defendants Diamond and Fefferman, as well as the separately charged Steven Garcia. While working for Garcia, Gary learned that Garcia arranged for his own appraisal management company to prepare appraisals for Diamond's and Fefferman's clients. This was against rules designed to ensure that appraisals were done impartially. In addition to the appraisal fee shown on HUD-1 settlement documents, Garcia charged a separate fee for these inflated appraisals. Garcia collected that fee by withholding a portion of the commission payment that was supposed to be paid to the loan originator assigned to the file. Garcia saw this extra amount as "his" money because it was his appraisal company that allowed for a higher loan. To keep his job with Garcia, Gary did not object to this arrangement. When he complained about how he was treated by Garcia, Diamond, and later Fefferman, reimbursed Gary such that he was able to receive his full commission on loan originations. Whereas Garcia received millions of dollars in fees and Diamond and Fefferman received millions of dollars in loan proceeds, Gary was paid a small commission for each transaction.

As Gary continued to work for Garcia, he learned that certain homeowners complained about Diamond not completing the work that he promised to perform. Gary took steps to address customer complaints but ultimately was not successful in dealing with Diamond. Gary cut off all contact with Diamond in 2014. Unlike the situation with Diamond, Gary always believed that Fefferman was performing the work. That said, Gary knew that Fefferman sought to set his contract price to approximate the amount of proceeds that the homeowner could get from the reverse mortgages based on the appraisals arranged by Garcia.

In about 2013, there were new rules that limited the amount of money that could be paid out at the closing of a reverse mortgage. Gary learned from a conversation with Garcia and an uncharged individual that contractors could receive more than the limit if the amount was used to resolve a mechanic's lien at closing. Gary believes that he unfortunately informed both Diamond and Fefferman of this exception. Thereafter, Gary was aware that Diamond and Fefferman filed liens falsely claiming that they already had performed work when in fact these contractors had not completed the work. Gary deeply regrets going along with the scheme.

Gary has deep remorse for not raising his hand and bringing attention to Garcia's, Diamond's, and Fefferman's conduct. Again, the fact that Gary relied upon his employment with Garcia to support him and his daughter is no excuse for looking the other way. In addition to actively cooperating with law enforcement, Gary voluntarily sought permission from the court to start paying early restitution (Dkt. #270). To date, Gary has made three separate payments totaling $20,000. Gary hopes to make more payments now that his divorce is final.

  C.  **The Advisory Guideline Range**

The Seventh Circuit has outlined three steps in considering the guidelines. *United States v. Loving,* 22 F. 4th 630, 636 (7th Cir. 2022). First, the court must correctly calculate the applicable

guideline range. Second, the court may consider the advice in the Sentencing Guidelines about potential departures. Third, the court must consider the § 3553(a) factors and determine whether to accept or reject the advice of the guidelines. *Id.* As explained by the Court, while sentencing courts are not required to engage in the traditional departure analysis, departures are not "obsolete" and play an "integral role in the advisory guideline sentencing system." *Id.*

The Probation Department correctly calculated the advisory guideline range as 57-71 months before consideration of Gary's cooperation. The adjusted offense level of 24 was driven in large part by the 14-level increase based on approximately $923,000 in proceeds. The defendant respectfully submits that this loss amount significantly overstates the seriousness of his role in the conduct. Application Note 21(C) provides that there are cases "in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such a case, a downward departure may be warranted." USSG § 2B1.1, App. Note 21(C). This in fact is "an encouraged basis for departure." *United States v. Corry,* 206 F.3d 748, 751 (7th Cir. 2000). For example, in *United States v. Forchette*, 220 F. Supp. 2d 914, 925-927 (E.D. Wis. 2002), the district court held that a downward departure was appropriate for a participant in a fraud scheme for three reasons. First, the court explained that the scheme in which the defendant participated was masterminded by a co-defendant. The defendant's role was that of a middleman. The co-defendant decided the amount of the fraudulent checks at issue and thus "controlled the amount of loss produced." *Id.* at 926. Second, "defendant's share of the proceeds was consistently minimal." *Id.* Third, defendant did not fully understand the nature and scope of the co-defendant's activities. *Id.* at 927.

These same reasons support a departure in this case. The scheme was masterminded by Garcia, Diamond, and Fefferman. They received the lion's share of the proceeds while Gary's

compensation was consistently minimal, a small commission on each of the transactions. Further, although Gary learned more over the course of time and certainly knew better, he was never aware of the full extent of Garcia's and Diamond's activity. Importantly, the defendant does not make this request to minimize his culpability. As shown through his cooperation, his acceptance of the restitution obligation (for money that he did not receive), and his early efforts to pay restitution, Gary fully accepts responsibility for his criminal conduct. The undersigned respectfully submits that the 14-level increase in the offense level overstates defendant's role in the offense.

The defendant also respectfully submits that his criminal history is overstated. Gary was convicted of possession (<u>not</u> distribution) of controlled substances after an arrest in 2002. He was sentenced to 4 ½ months' imprisonment. Thus, his criminal history category of II was driven by a twenty-three-year-old conviction that arises out of his past drug use. As noted above, Gary quit using drugs when his daughter was born. His past conviction in no way demonstrates a risk of recidivism. As noted, he cooperated extensively in this and other matters and has fully complied with his bond conditions for more than 10 years.

Further, recognizing that Gary's criminal history category is overstated would be fair considering the government's position in a related case. More specifically, in *United States v. Garcia*, 17 CR 798, the government took note of Steven Garcia's past drug convictions and recognized that his category "substantially overstates the seriousness of Steven Garcia's criminal history and substantially overstates the likelihood of recidivism. In particular, Steven's prior criminal history appears to be a function of substance abuse and not an intent to victimize others." *United States v. Garcia,* 17 CR 798, Docket # 70, at 1-2. This same is true for Gary.

While the calculation of a guideline range is always important, it is especially so for Gary. The government has informed the undersigned that, based on Gary's cooperation, it will

recommend that an appropriate sentence would be 50% of the low end of the guideline range, consistent with past policy and practices. Gary respectfully submits that recognizing the offense level and that his criminal history category are overstated is crucial to fashioning an appropriate sentence.

> **D.** **The Kinds of Sentences Available**

The Court must also take into consideration "the kinds of sentences available" under 18 U.S.C. § 3553(a)(3). There is no statutory minimum sentence, and Gary is therefore eligible for a sentence of probation. The Seventh Circuit has called upon district court judges to consider the cost that the government incurs in incarcerating older individuals like Gary who is 59-years old. *United States v. Presley,* 790 F.3d 699, 702 (7th Cir. 2015). Prisoners at least fifty years old cost the federal prison system about eight percent (8%) more than younger prisoners, and those costs only rise with age. *Id.* (citing Office of the Inspector General, U.S. Dept. of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, May 2015 (https://oig.justice.gov/reports/2015/e1505)). Indeed, since the pandemic and the passage of the First Step Act, the Bureau of Prisons has increasingly exercised its authority to compassionately release aging and physically vulnerable federal prisoners. A sentence of three years' probation is an alternative sentence that is appropriate in Gary's case. Further, a sentence of probation will allow Gary to remain employed and continue to work to pay his restitution obligation.

> **E.** **The Need to Reflect the Seriousness of the Offense and Provide Deterrence**

The defendant respectfully submits that a sentence of imprisonment would be greater than necessary to protect the public or deter him from criminal conduct. Gary has accepted responsibility and does not pose a risk of committing new crimes. His actions have caused him and his family significant public embarrassment and shame. Gary hopes that the Court will focus

on his acceptance of responsibility as well as his extraordinary efforts to cooperate with the investigation in this and related cases. As the Supreme Court recognized in *Gall*, a sentence of probation involves a "substantial restriction of freedom." *Gall*, 552 U.S. at 48, 128 S.Ct. 586. And, recidivism rates consistently decline as age increases. See, U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders, p. 3, 22-23 (Dec. 2017); *United States v. Carter,* 538 F.3d 784, 791-92 (7th Cir. 2008). Accordingly, the undersigned respectfully suggests that a sentence of probation (along with the order of restitution) is sufficient to address deterrence and – importantly -- act as incentive for others to cooperate with authorities.

F. **The Need to Avoid Sentencing Disparities.**

As acknowledged by the government, Gary's cooperation substantially assisted its investigation and prosecutions in this matter. The government was able to secure guilty pleas in this case *and* bring charges against Steven Garcia as well as his brother, Michael Garcia, in a separately charged case, *United States v. Garcia,* 17 CR 798 (N.D. Ill.). That case related to Garcia's appraisal company and was based in part on the multiple recorded conversations that Gary made. Both defendants in that case agreed to plead guilty. And, in addition to his cooperation with federal authorities, Gary participated in a lengthy proffer with the Illinois Attorney General and state authorities in November 2020. As a result of his cooperation, the government has agreed to move the court, pursuant to USSG § 5K1.1, to depart downward from the low end of the applicable guideline range. Pursuant to the plea agreement, Gary is free to recommend any sentence.

Steven Garcia, for whom Gary worked, received a sentence of one day imprisonment and an order of restitution in the approximate amount of $2.1 million based on his fraud conviction. In its sentencing recommendation in the Garcia case, the government advanced several mitigation

arguments that are equally applicable here. (*United States v. Garcia*, 17 CR 798, Dkt. 70, at 4) First, the government noted that the Garcia's quickly "expressed their intention to plead guilty to the charges in this case." (*Id.*) That is true of Gary as well, except he went much, much further. Gary wore a wire on several occasions, actively cooperating with federal officials to make the case against the Garcia's. And, as acknowledged by the government, Gary stood ready to testify in this and other cases had there been a trial. Unlike in Gary's case, the government did not agree to move for a departure based on USSG § 5K1.1 for Garcia.

Second, the government in *Garcia* observed that a "significant amount of time has passed since [the] offense and since the Garcias have been charged. During this time, the Garcia's good conduct has lessened the need for a serious sentence." (*Id.*) This is similarly true for Gary. More than ten years have passed since he was contacted by law enforcement and almost ten since he was charged. During that time, Gary has fully complied with his bond conditions, extensively cooperated with the government's investigation, made early restitution payments, supported his ailing mother and autistic daughter, and volunteered with multiple community organizations. To be fair and consistent, the government must agree that Gary's good conduct has lessened the need for a serious sentence.

Gary respectfully submits that having cooperated against his former bosses (the Garcia's), and considering all the § 3553 factors, a sentence of probation and an order of restitution is an appropriate punishment that avoids any sentencing disparity.

### III. CORRECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Gary respectfully submits that the presentence investigation report requires the following corrections:

13

Page 2. The report incorrectly states that there are no related cases. The government separately charged Steven Garcia and Michael Garcia with related conduct in 17 CR 798.

Page 10, ¶ 34. The report incorrectly states that "Mr. Bohn's conduct in the offense and relevant conduct involved … the filing of false liens over the course of several years." Further, it states that "Mr. Bohn began filing the false liens in an attempt to continue the same fraud scheme." These statements are not correct. Mr. Bohn did not prepare of file the false liens. Diamond and Fefferman prepared and filed the false liens.

Page 15, ¶ 63. The correct spelling of Mr. Bohn's mother's first name is "Frances."

Page 19, ¶ 82. Mr. Bohn participated in substance abuse treatment as a condition of probation in the 2002 case.

## IV. SUPERVISED RELEASE

Defendant has reviewed the Probation Office's recommendations of conditions of supervised release with his undersigned counsel and has no objections.

## V. CONCLUSION

Gary Bohn is a good man who is devoted to his family and his community. He overcame a difficult childhood and, as an adult, is known as a kind, thoughtful, and hard-working man. He will carry deep regret for his conduct the rest of his life. Counsel respectfully submits that a sentence of three years' probation and an order of restitution is a sufficient, but not greater than necessary, sentence based on Gary's limited role in the scheme, active cooperation in this and other cases, early payment of restitution, and the need to avoid sentencing disparity.

Dated: October 1, 2025                                     Respectfully submitted,

                                                           /s/ Daniel Collins
                                                           Daniel J. Collins (ARDC #6224698)

Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661
312-902-5434
[Daniel.Collins@katten.com](mailto:Daniel.Collins@katten.com)

Attorney for Gary T. Bohn