UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 16 CR 54-4 |
| v. | Honorable Franklin U. Valderrama |
| GARY THOMAS BOHN | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, hereby submits its position paper as to sentencing factors for defendant Gary Bohn. In consideration of the advisory Guideline range, statutory sentencing factors, and cooperation given, the government recommends a below-Guideline sentence of 28 months of imprisonment and a 2-year term of supervised release.

## I.   OVERVIEW OF THE OFFENSE CONDUCT

### A.    Reverse Mortgage Scam

Bohn was an Illinois licensed loan originator employed by American Fidelity Financial Services, Inc. ("American Fidelity"), an Illinois licensed mortgage brokerage. Bohn, along with Mark Diamond, Cynthia Wallace, Matthew Fefferman, and Forrest Fawcett,[1] engaged in a wide-spread reverse mortgage scheme to defraud dozens of elderly homeowners. Bohn directly participated in and benefitted from the fraud scheme, by *inter alia*: (1) facilitating the reverse mortgage loan originations; (2) conspiring with Diamond to enable him to act as a *de facto* loan officer, when

---

[1]   Fawcett is charged in separate case number 17 CR 157 (N.D. Ill.) (Seeger, J.) and is awaiting sentencing.

1

Diamond did not have authorization to originate loans; (3) submitting loan documentation to the lenders falsely identifying himself as the loan originator; (4) devising a way for defendants to avoid HUD rules designed to protect homeowners; and (5) at times, giving Fefferman the victims' loan proceeds checks.

As described in other court filings, co-defendant Diamond was an Illinois licensed loan originator and president of OSI Financial Services, Inc. ("OSI"), an Illinois licensed mortgage brokerage, and of United Residential Services & Real Estate, Inc. ("URS"), a home repair general contractor. Diamond was the original architect of key components of the fraud scheme, which involved obtaining reverse mortgage loans in the names of his victims. A reverse mortgage was a type of refinance loan through which homeowners aged 62 or over borrowed equity in their primary residence, which did not become due until the homeowner died. Reverse mortgage loan payouts were in the form of a line of credit or lump sum, with limits on the size of the lump sum payout.

Initially, Diamond worked with Fefferman's company, Harbor Financial, to originate the loans. Starting in approximately 2010, Diamond worked with Bohn. In heartless fashion, defendants centered the scheme in primarily African-American neighborhoods populated by long-term homeowners. Diamond and Fefferman confused and tricked the victims into signing reverse mortgage loan applications in exchange for promised home repairs, and pocketed the home equity without completing the work. When the reverse mortgage loans became due, some surviving family members, having lost the home equity, could not pay the loans.

2

### B. Use of Appraisals to Maximize the Theft

While at American Fidelity, Bohn learned that one of its owners, Steven Garcia, owned an appraisal company ("AMC"). The AMC conducted the appraisals for the loan applications, which Bohn knew was a conflict of interest and violated state rules to ensure that appraisals submitted to lenders were impartial.

The AMC appraised the values of the homes at the high end of the possible range of market value, thus maximizing on paper the amount of home equity in the victim's residence. Garcia charged Bohn a fee for each appraisal, which Bohn recouped from Diamond and Fefferman off the books to hide this part of the scheme.

### C. End-Run Around HUD Rules

In 2013, HUD implemented new rules limiting the amount of cash that could be paid out to reverse mortgage borrowers at closings. HUD implemented the rules to minimize the financial risk to borrowers later in their lives when the loans came due and to mitigate the risk of default to the lenders. Bohn identified a way around the HUD rules to continue extracting large amounts of home equity. Specifically, Bohn told Diamond and Fefferman that the HUD rules did not limit the amount of money that could be paid at closing to pay off a mechanics lien. Capitalizing on this path, from 2013 through February 2015, Diamond and Fefferman filed mechanics liens falsely representing that they completed home repairs in the dollar amounts of the liens. Bohn then utilized the liens in loan documentation to obtain the home equity payouts.

Bohn's decision to tell Diamond and Fefferman how to avoid the HUD rules was not a slip of the tongue or an innocuous conversation. Bohn knew by 2012 that homeowners had complained that Diamond did not complete the promised home repairs. In addition, before Fefferman filed the mechanics liens, Bohn gave Fefferman information about the amount of equity available. As Bohn expected, Fefferman used the information to file a lien in approximately that amount.

An example of the lien component of the scam is described in the count of conviction (Count 12), which charges that from approximately 2010 through February 2015, Bohn and the co-schemers devised and participated in the fraud scheme, and to effectuate the scheme, Bohn caused to be transmitted in interstate commerce an email dated February 16, 2015 that falsely represented to Cherry Creek Mortgage that Holloway had completed repair work at Victim M.B.'s residence in Chicago when the work was not performed.[2] Bohn pleaded guilty to Count 12 pursuant to a written Plea Agreement.

## II. MAXIMUM PENALTIES

Count 12 carries the following maximum penalties:

     a.     A maximum sentence of 30 years' imprisonment. PSR, ¶ 93.

     b.     Maximum fine of $1,000,000, or twice the gross gain or gross loss resulting from the offense, whichever is greater. PSR, ¶ 102.

     c.     Term of supervised release not exceeding 5 years. PSR, ¶ 97.

---

[2] The scheme as to Victim M.B. ultimately was not successful, and this victim did not suffer a loss.

       d.      Restitution to the victims of the offense in an amount determined by the Court.  PSR, ¶ 20; 18 U.S.C. § 3663A.

       e.      $100 special assessment.  PSR, ¶ 103.

## III.    ADVISORY GUIDELINE RANGE

The PSR identifies a total offense level of 24.  An offense level of 24, together with a criminal history category of II, yields an advisory range of 57 to 71 months of imprisonment.  PSR, ¶ 94.  The government calculates the same advisory range as the PSR but through a different methodology.

### A.    Revised Loss Amount of $393,896

When the parties executed their Plea Agreement in January 2024, they identified a loss and mandatory restitution totaling $923,000.  Plea Agreement, ¶ 10(b)(ii) (Dkt. 391); PSR, ¶ 31; *see also* Government's Version of the Offense ("GVO") at Exhibits 1, 2 (identifying Bohn victims for restitution purposes).  Since then, the government, in separate plea discussions with Diamond and Fefferman, gave those defendants additional credits against loss for the same victims, based on payments they made to contractors for claimed home repair work.  As a conservative measure, and for consistency, the government gives Bohn those same credits.  Exhibit A identifies the revised amounts of restitution to be paid to each victim, totaling $393,896.  The reduced loss amount lowers the previously anticipated offense level by two levels, resulting in a 12-level increase under Guideline § 2B1.1(b)(1)(G) instead of the 14-level increase identified in the PSR.

### B.    Sophisticated Means Enhancement

The government disagrees with the Probation Office's decision not to apply the enhancement for sophisticated means.  PSR, ¶¶ 34-36.  Guideline 2B1.1(b)(10)(C) imposes a 2-level enhancement for offense conduct perpetrated by a defendant involving sophisticated means.  The "essence of the definition of sophisticated means is merely deliberate steps taken to make the offense . . . difficult to detect." *United States v. Kowalski*, 103 F.4th 1273, 1279 (7th Cir.  2021) (citations omitted) (cleaned up).  The inquiry is whether, in the context of the overall fraud scheme, Bohn's conduct in the aggregate was sophisticated.  *United States v. Griffin*, 74 F.4th 724, 752 (7th Cir. 2023); *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (citation omitted) (enhancement is appropriate when "the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense").

The Court applied the enhancement in Diamond's case and should do so here. Bohn undertook multiple acts in furtherance of the fraud scheme over an extended period of time, harming over 20 individual victims.  Bohn's conduct included, among other things:

●    Preparing loan application documentation falsely identifying Bohn as the loan originator, when in fact Diamond and Fefferman performed those functions;

●    Using appraisals performed by an AMC surreptitiously owned by Steven Garcia to extract home equity;

●    Taking undisclosed payments from Diamond and Fefferman to

hide the use of the AMC to conduct the appraisals;

●  Devising a way around the HUD rules limiting the amount of cash at closing; and

●  Giving Fefferman advance notification of appraisal values so that Fefferman could prepare and file lien documentation falsely representing that his businesses had performed home repairs in those amounts.

Although Diamond committed the fraud on a wider scale, and Diamond engaged in additional egregious conduct such as impersonating victims to the lenders (PSR, ¶ 35), application of the enhancement does not require that Bohn replicate those same bad acts. Here, Bohn was the conduit between his co-schemers and the lenders, and his participation in the multi-faceted deception made the offense far more difficult to detect. Bohn's actions victimized the homeowners who lost their equity and deceived the lenders into issuing loans they would not otherwise have approved.

Although each case presents its own set of aggregate facts, the Seventh Circuit has affirmed the application of the sophisticated means enhancement in mortgage fraud cases such as this one where the scheme was complex. In *United States v. Sheneman*, 682 F.3d 623, 632 (7th Cir. 2012), the court applied the enhancement in a case where the scheme duped individuals into buying properties they could not afford. The Court observed that, just like Bohn, the *Sheneman* defendants "relied on their extensive knowledge of the real estate market and lending industry to perpetrate the scheme and avoid detection for several years" and "fooled mortgage

7

lenders into financing the purchases by falsifying loan documents" and other lies. *Id.*; *see also United States v. Peterson*, 891 F.3d 296, 299-300 (7th Cir. 2018) (fraud scheme involved "significant actions to conceal the trail of money and to obscure the identity of the provider and recipient of funds"); *Knox*, 624 F.3d at 871 (scheme included, among other things, falsifying mortgage loan applications and using inflated appraisals); *United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013) (scheme included straw buyers and "creation of both false loan applications and false documents to support the misinformation in the false loan applications"); *United States v. Green*, 648 F.3d 569, 566-577 (7th Cir. 2011) (fraud scheme included recruiting straw purchasers to fraudulently obtain mortgages and fraudulent loan applications).

Notably, Bohn also identified, communicated to the co-schemers, and helped to implement the end-run around HUD rules through filing false mechanics liens to increase the cash payouts at closing. Bohn's conduct regarding the liens was in addition to all the other steps he took to fabricate loan documentation, and his participation required specialized knowledge of the industry and applicable lending rules.

Applying the sophisticated means enhancement, together with the additional enhancements identified in the PSR (¶¶ 32, 37), produces a total offense level of 24. PSR, ¶ 44. A total offense level of 24 and a criminal history category of II, produces an advisory Guideline range of 57 to 71 months of imprisonment. PSR, ¶ 94.

## IV.    SECTION § 3553(a) FACTORS

By every measure, the offense conduct in this case was serious and caused significant, lasting harm to members the community.  Through his participation in the scheme and by serving as the necessary link to the lenders, Bohn preyed upon vulnerable and elderly homeowners to steal equity in their homes.  Then, after HUD imposed limits on lump-sum equity payouts, Bohn devised a way around the rules through the concept of filing inflated mechanics liens.

At Diamond's sentencing hearing, victims of the offense spoke at length about the pain of losing their hard-earned home equity and the family homes they hoped to pass down to future generations.  *See* Dkt. 504 (sentencing transcript).  Apart from the financial impact of the fraud, the victims' homes were filled with lifetimes of memories, and the emotional attachment to one's home cannot be quantified in dollars.  The crime was also heinous in that defendants stole from elderly people, shattering their trust and sense of stability.  It was cruel for defendants to take victims' home equity without any regard for the fear and loss the families would experience when lenders inevitably came calling for payment.

Bohn has a prior conviction for cocaine distribution in 1989, and a second conviction for possessing cocaine in 2004.  It appears from the PSR that those convictions stemmed from a cocaine addiction, which Bohn took measures to address.  PSR, ¶¶ 81, 84.  It is an aggravating factor at sentencing, however, that Bohn subsequently broke the law in other ways, hurting elderly homeowners, and that he continued this offense after he stopped using cocaine.

The principal reason for the government's below-Guideline recommendation is defendant's cooperation, which the government will describe at greater length in a separate sealed attachment (Exhibit B). In consideration of the help given, the government recommends a 1/2 reduction from the low end of the Guideline range of 57 months, which totals 28 months (rounded down). A 28-month sentence appropriately weighs the totality of the statutory sentencing factors, including just punishment and need for deterrence.

## V. RESTITUTION

As described above, the government calculates the amount of restitution to be paid as $393,896. Exhibit A. To date, Bohn has paid $20,000 to the Clerk of the Court. The government will submit a separate restitution spreadsheet before sentencing.

## VI. SUPERVISED RELEASE

The government requests a 2-year term of supervised release with the conditions identified in the PSR. The Probation Office did not recommend supervised release (but identified conditions in the alternative), opining that Bohn is sufficiently independent and will not need assistance after a custodial sentence. The government recommends supervised release due to the pervasive fraud scheme Bohn committed and to monitor whether he is on the right track after release (for example, confirming that Bohn is able to readily resume employment as anticipated and maintains sobriety). The government further requests that the Court add to Discretionary Condition 4 a prohibition against communicating with Forrest Fawcett.

## CONCLUSION

Accordingly, the government requests that this Court impose a below-Guideline sentence of 28 months and a 2-year term of supervised release with conditions.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/ Erin Kelly*
    ERIN KELLY
    Assistant United States Attorneys
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-9083
    erin.kelly@usdoj.gov

# EXHIBIT A

| Borrower First Name | Borrower Last Name | Restitution Allocation $ | Joint and Several Cynthia Wallace | Joint and Several Mark Diamond | Joint and Several Matthew Fefferman |
|---|---|---|---|---|---|
| Alice | B. | $26,585.00 | | $26,585.00 | |
| Bruce | C. | $22,129.00 | | $22,129.00 | |
| Lula | C. | $24,666.00 | | | $24,666.00 |
| Bertha | D. | $24,415.00 | $24,415.00 | $24,415.00 | |
| Russell | H. | $26,020.00 | $26,020.00 | $26,020.00 | |
| J.C. | H. | $26,493.00 | | $26,493.00 | |
| Fletcher | H. | $24,799.00 | | $24,799.00 | |
| Dorothy | H. | $26,707.00 | $26,707.00 | $26,707.00 | |
| Ida | C. | $19,649.00 | | $19,649.00 | |
| Samuel | J. | $11,449.00 | | | $11,449.00 |
| Bernice | J. | $2,246.00 | | | $2,246.00 |
| Ethola | J. | $18,008.00 | | $18,008.00 | |
| Marjorie | P. | $8,880.00 | | | $8,880.00 |
| Johnny | R. | $20,330.00 | | | $20,330.00 |
| Gloria | R. | $14,700.00 | | | $14,700.00 |
| Hersey | S. | $8,775.00 | $8,775.00 | $8,775.00 | |
| Lee | S. | $6,868.00 | | $6,868.00 | |
| Edna | T. | $8,991.00 | | | $8,991.00 |
| Eddie | T. | $30,296.00 | | $30,296.00 | |
| Clara | W. | $13,544.00 | | $13,544.00 | |
| Walker | W. | $14,611.00 | | $14,611.00 | |
| Pearlie | W. | $13,735.00 | | $13,735.00 | |
| | | $393,896.00 | | | |